2003-NMCA-070

69 P.3d 243

**HOME AND LAND OWNERS, INC., a New Mexico non-profit corporation; Curtis Lombardi, Carroll Morrison and Jerry Weeks, Plaintiffs–Appellants,**

v.

**ANGEL FIRE RESORT OPERATIONS, L.L.C., a Texas limited liability company, and Association of Angel Fire Property Owners, a New Mexico non-profit corporation, Defendants–Appellees.**

No. 22,400.

Court of Appeals of New Mexico.

March 18, 2003.

Thomas A. Simons, IV, Charles V. Henry, IV, The Simons Firm, LLP, Santa Fe, NM, for Appellants.

Terrence R. Kamm, Kamm & McConnell, L.L.C., Raton, NM, for Appellee–Association of Angel Fire Property Owners.

Daniel E. Rakes, Angel Fire, NM, Walter L. Reardon, Jr., Watrous & Reardon, William S. Dixon, Edward R. Ricco, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, NM, for Appellee–Angel Fire Resort Operations, L.L.C.

## OPINION

WECHSLER, Chief Judge.

{1} Plaintiffs appeal from a district court order awarding summary judgment in favor of Defendants and denying Plaintiffs' request to amend their complaint. Based upon our determination that the doctrine of merger is inapplicable under the circumstances presented by this case, the district court properly concluded that the bankruptcy documents should be construed together. In addition, we decline to remand this case to the district court for consideration of the issue of the parties' intent. The district court did not abuse its discretion in denying Plaintiffs' motion to amend. We therefore affirm.

## Background

{2} Angel Fire is a resort community located in Colfax County. Owners of real property within the resort area are assessed annual fees, the amount of which varies depending upon the nature of the property (e.g., residential or commercial; developed or undeveloped). In exchange for payment of the annual dues assessment, property owners receive a continued right of access to the Angel Fire ski area, golf course, country club, tennis courts, stables, and other amenities (the amenities). Restrictive Covenants, which were recorded each time a new subdivision was developed by the owner of the resort, initially secured this right of access.

{3} In 1993, the Angel Fire Corporation (the Corporation), which owned the resort at that time, and other related debtors, commenced a Chapter 11 bankruptcy proceeding under the Federal Bankruptcy Code. As part of the Chapter 11 reorganization effort, Defendant Angel Fire Resort Operations (the Resort) agreed to purchase certain assets and liabilities from the estate of the bankrupt Corporation, including real property interests in the amenities. Pursuant to the Bankruptcy Code, various creditors, including a committee of property owners, submitted proposed plans for reorganization, each of which outlined the rights and obligations of those affected by the bankruptcy proceeding and the Resort's purchase of the amenities. Following negotiations between the various creditor groups and the bankruptcy trustee, an amended joint plan of reorganization (the Plan) was filed with and confirmed by the bankruptcy court. The Plan was accepted by a majority of all classes of claimants required to vote on it, including the property owners.

{4} While the bankruptcy proceeding was pending, a committee of property owners filed an adversary proceeding against the Corporation in bankruptcy court, seeking a declaratory judgment to clarify and protect their amenity rights. In order to resolve

that lawsuit, the Resort expressly agreed, pursuant to Section 4.16(a) of the Plan, to execute and record a negative easement—the Supplemental Declaration of Restrictive Covenants and Easements (Supplemental Declaration). The Supplemental Declaration was designed to clarify and make uniform the amenity rights of the property owners. Prior to confirmation, the Supplemental Declaration was executed as required by Section 4.16(a) and attached to the Plan as "Exhibit E." Both the Plan and the Supplemental Declaration were recorded in the real property records of Colfax County following the confirmation.

{5} The Supplemental Declaration fixes the amount of the annual dues assessment for the 1995–1996 season and provides that the assessment may thereafter be increased annually by an amount equal to the increase in the Consumer Price Index. Although the document does not set forth specific provisions governing the use of the amenities by the property owners, it acknowledges that the Resort and the official home owners' association, the Association of Angel Fire Property Owners (AAFPO), had previously adopted rules and regulations related to such use. At the time the Supplemental Declaration was recorded, property owners who paid their annual assessments in full were granted unlimited access to the amenities without incurring additional charges, such as green fees or lift ticket costs.

{6} The Plan itself also contains various provisions relating to the annual assessment and property owner use of the amenities. Section 4.16(h) permits the Resort to modify the annual assessment structure for new homesites and for existing homesites that are sold or transferred after September 1996. By contrast, sales prior to that date and transfers to children, parents, brothers, sisters, grandchildren, or grandparents of property owners are exempt from any such modifications and are subject only to the annual assessment structure in place at the time the Plan was confirmed.

{7} The Resort, with the approval of AAFPO, eventually implemented various restrictions on the use of the amenities by those who acquired property after May 24, 1997.

While existing property owners were still able to use the amenities free of charge, new property owners were allowed only a 20 percent discount on season ski lift passes and a 10 percent discount on daily green fees. This restriction applied even if the new property owners paid their annual assessments in full.

{8} In 1998, Plaintiffs Home and Land Owners, Inc. (HALO), a voluntary association of Angel Fire property owners, and three individual property owners filed suit against the Resort, seeking a declaratory judgment, injunctive relief, and damages stemming from alleged violations of the Unfair Trade Practices Act. Plaintiffs asserted, among other things, that the Resort violated the provisions of the Supplemental Declaration when it elected to modify the amenities structure with regard to those who acquired property after May 24, 1997. While Plaintiffs' other assertions, including the improper collection of prior dues and assessment of multiple lots, also relate to differences between the Supplemental Declaration and the Plan, we do not discuss these assertions because they do not present any distinction to our analysis.

{9} Plaintiffs later filed an amended complaint, joining AAFPO which had, pursuant to Section 4.16(e) of the Plan, voted to approve the challenged modifications of the amenities structure. After receiving discovery responses from the Resort, Plaintiffs requested permission from the district court to amend their complaint once more to incorporate a cause of action for breach of fiduciary duty against AAFPO and for breach of contract against both AAFPO and the Resort. In addition, Plaintiffs and the Resort filed cross-motions for summary judgment. AAFPO aligned itself with the Resort's position, opposing Plaintiffs' motions.

{10} In support of their motion for summary judgment, Plaintiffs asserted that the property owners' rights and obligations were defined solely by the Supplemental Declaration. Specifically, Plaintiffs argued that the Plan merged with the Supplemental Declaration once the easement was executed and recorded. Because the Supplemental Declaration is, by its express terms, a covenant running with the land, Plaintiffs alleged that AAFPO could not approve and the Resort

could not implement the challenged modifications to the amenities structure.

{11} The Resort and AAFPO (Defendants) argued that the doctrine of merger was not applicable given the facts of this case and that the Supplemental Declaration had to be read together with the Plan in order to define the property owners' amenity rights and obligations. In addition, Defendants asserted that HALO lacked standing to bring suit.

{12} Following a hearing on the motions, the district court filed a letter decision, holding that the Plan and the Supplemental Declaration should "be read and construed together" and finding that the parties had intended the two documents to be "interlinked." The district court thereafter entered an order denying Plaintiffs' request to amend their complaint and granting summary judgment in favor of Defendants. The court did not rule on the issue of HALO's standing, but strongly suggested that the organization lacked the authority to bring suit. After unsuccessfully moving for reconsideration, Plaintiffs appealed.

*Summary Judgment*

{13} Plaintiffs assert that the district court erred in granting summary judgment for Defendants, arguing that the district court should have applied the doctrine of merger and referenced only the Supplemental Declaration, and not the Plan, when determining Plaintiffs' amenity rights and obligations. In the alternative, Plaintiffs contend that a genuine issue of material fact remains with regard to interpretation of the documents.

*Doctrine of Merger*

■ {14} The doctrine of merger has long had a place in New Mexico's law of real property. *See, e.g., Norment v. Turley,* 24 N.M. 526, 529, 174 P. 999, 1000 (1918). As a general rule, parties to a real property transaction must look solely to the instrument that conveyed the property rights in order to determine their rights and responsibilities. *Id.* Thus, upon execution of a deed, the contract of sale effectively disappears, thereby nullifying any provisions that were included in the contract but not expressly incorporated into the deed. *Id.* In this case, we deter-

mine whether the doctrine of merger should be applied to documents executed within the unique context of a Chapter 11 bankruptcy proceeding. We review this legal question de novo. *See Self v. United Parcel Serv., Inc.,* 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582.

{15} Plaintiffs argue that the Supplemental Declaration was given and accepted as performance of the Plan, which was the previous contract, and that the Plan was thereafter conclusively merged into the Supplemental Declaration. Accordingly, they maintain that the district court should have looked solely to the Supplemental Declaration, and not to the Plan, when evaluating the rights and obligations of the parties with respect to the amenities. We do not agree.

■ {16} "The object in a[C]hapter 11 reorganization case is normally to formulate a restructuring or reorganization plan that will enable the debtor to emerge from bankruptcy as a viable, profitable enterprise." 7 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 1100.09, at 1100–26 to –27 (15th ed. rev.2002). In order to facilitate this objective, "[n]ew legal relationships are established and old ones are modified or terminated." *In re Page,* 118 B.R. 456, 460 (Bankr. N.D.Tex.1990) (internal quotation marks and citation omitted). Thus, in a bankruptcy proceeding, creditors must negotiate with one another and with the trustee in order to protect their interests and minimize their losses. To that end, creditors may submit proposed reorganization plans to the trustee for consideration. 11 U.S.C. § 1121(c) (2000). In addition, creditors are required to vote on the compromise plan prior to its confirmation by the bankruptcy court. 11 U.S.C. § 1126(a) (2000).

{17} A reorganization plan that results from this series of creditor negotiations is often lengthy and complex, addressing the rights and obligations of a wide range of creditors and of the debtor. Once confirmed, however, a plan is binding on all creditors, regardless of whether they acquiesce to its terms, and is enforceable as a court order. *See* 11 U.S.C. § 1141(a) (2000); *In re CF & I Fabricators of Utah, Inc.,* 150 F.3d 1233,

1239 (10th Cir.1998); *In re K.D. Co.*, 254 B.R. 480, 490 (B.A.P. 10th Cir.2000).

{18} Because a reorganization plan is the complex product of negotiations between parties with disparate interests, the federal bankruptcy courts have consistently construed the provisions of a confirmed plan as a whole, in accordance with general principles of contract interpretation. *See, e.g., In re Commercial Millwright Serv. Corp.*, 245 B.R. 585, 593 (Bankr.N.D.Iowa 1998); *United States ex rel. Farmers Home Admin. v. Cook*, 147 B.R. 513, 516 (D.S.D.1992); *see also Segura v. Kaiser Steel Corp.*, 102 N.M. 535, 538, 697 P.2d 954, 957 (Ct.App.1984). When, as in this case, the plan includes various exhibits and other related documents, "[t]he Confirmed Plan must be read so as to include the provisions of all documents which were confirmed together." *In re Erie Hilton Joint Venture*, 137 B.R. 165, 171 (Bankr. W.D.Pa.1992); *accord In re Penberthy*, 211 B.R. 391, 395–96 (Bankr.W.D.Wash.1997), *and In re Sugarhouse Realty, Inc.*, 192 B.R. 355, 363 (E.D.Pa.1996); *see also Levenson v. Haynes*, 1997–NMCA–020, ¶ 14, 123 N.M. 106, 934 P.2d 300 (stating that "instruments executed at the same time, by the same parties, for the same purpose, and in [the] course of the same transaction" should "be read and construed together") (internal quotation marks and citation omitted). This is so even when, as in this case, the plan provides for the sale of real property assets as part of the reorganization. *See In re Sugarhouse Realty, Inc.*, 192 B.R. at 363 (stating that the plan, or contract, included the Agreement of Sale of the debtor's real property).

{19} We decline to adopt an approach contrary to that taken by the bankruptcy courts. Because the Supplemental Declaration was confirmed with the Plan, the bankruptcy documents must be construed together, in their entirety, when determining the rights and obligations of the parties with respect to the amenities. Thus, under these circumstances, and in particular that the bankruptcy documents are approved judicially and become enforceable like orders, the doctrine of merger is inapplicable.

{20} The documents themselves lend support to our conclusion that the Plan did not merge with the Supplemental Declaration. The Plan refers to the Supplemental Declaration, which in turn refers to the bankruptcy proceeding. Specifically, Section 1.66 of the Plan defines "Negative Easement" by way of reference to both the Supplemental Declaration and Section 4.16 of the Plan. Paragraph 8(A) of the Supplemental Declaration states that the easement replaces and supercedes any provisions in the Restrictive Covenants that relate to the amenities, but makes no such statement regarding the amenity provisions in the Plan. Similarly, the disclosure statement approved by the bankruptcy court and distributed to creditors in connection with the vote which approved the Plan expressly states that the Plan "is complicated and all of its terms and conditions interrelate and must be read together." *See Penberthy*, 211 B.R. at 395–96 (considering disclosure statement in determining debtor's obligations under the plan).

{21} Given the central role of a reorganization plan in reconciling the competing interests of the debtor and creditors and the comprehensive and binding nature of a plan as it relates to post-bankruptcy rights, we are unwilling to conclude that only part of the plan should be considered when determining the ongoing rights and obligations of the parties who negotiated the plan. The district court did not err in determining that the Plan and the Supplemental Declaration were "interlinked" and should "be read and construed together."

*Existence of Factual Issues*

{22} Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Self*, 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582. Plaintiffs argue on appeal that genuine issues of fact remain with regard to interpretation and application of the provisions of the Plan and the Supplemental Declaration. Specifically, they assert that the agreement is susceptible of different interpretations and is therefore ambiguous. Accordingly, Plaintiffs request that

we remand this case for an examination of the parties' intent.

{23} Plaintiffs did not raise this argument in the district court at or before the summary judgment hearing. The only factual argument Plaintiffs raised below was limited to Plaintiffs' contention that changes in the amenities structure under the Supplemental Declaration could only be made if they were reasonable. But the district court did not rule that any changes were being made under the Supplemental Declaration. It ruled that the changes were made pursuant to rights it found when reading all the bankruptcy documents together. To the extent that Plaintiffs claim that ambiguities in the documents, when read together, raise issues of fact, they waited until the district court ruled and then moved for reconsideration. Our modern cases require that issues on motions for summary judgment be presented to the district court with the same clarity and timeliness as other issues. *See Spectron Dev. Lab. v. Am. Hollow Boring Co.*, 1997–NMCA–025, ¶¶ 30–32, 123 N.M. 170, 936 P.2d 852. Although the district court may reconsider its ruling on such motions and even review evidence that was not presented earlier, it need not do so. *See In re Estate of Keeney*, 121 N.M. 58, 60, 908 P.2d 751, 753 (Ct.App.1995). In this case, the district court did not act on the motion for reconsideration, which was deemed denied. We see no reason why we should review on appeal matters that the district court did not consider.

{24} Even if we were to review Plaintiffs' claim that factual issues exist, we would rule otherwise.

{25} In its order granting Defendants' motion for summary judgment, the district court entered a declaratory judgment as to several issues. Specifically, the court declared that Defendants are "entitled to create new membership programs under [the Plan] and the creation of a new program does not violate the rights of property owners who owned property as of the effective date of [the Plan]." Because the parties had not previously raised any issues of fact, the district court apparently adopted the position, agreed upon by both parties, that the documents were not ambiguous. Therefore, the declaratory judgment was necessarily based upon the district court's determination that the documents were susceptible of only the interpretation advanced by Defendants.

{26} "[W]here the parties agree to have the district court decide an issue on cross-motions for summary judgment without raising issues of fact ... we will review the case on the same basis as it was presented below." *Montano v. Allstate Indem. Co.*, 2003–NMCA–066, ¶ 5, 133 N.M. 696, 68 P.3d 936. Because the parties consented to allow the district court to decide the issues as a matter of law without raising issues of fact, we evaluate whether the documents were ambiguous according to the ordinary summary judgment de novo standard of review. *See Nearburg v. Yates Petroleum Corp.*, 1997–NMCA–069, ¶¶ 7–8, 123 N.M. 526, 943 P.2d 560.

{27} "A contract is ambiguous if the court determines it can reasonably and fairly be interpreted in different ways." *Id.* ¶ 7. However, an ambiguity is not established simply because the parties disagree over the contract's proper construction. *Kirkpatrick v. Introspect Healthcare Corp.*, 114 N.M. 706, 711, 845 P.2d 800, 805 (1992). Because resolution of this issue depends upon the interpretation of documentary evidence, we are in as good a position as the district court to interpret the provisions of the Plan and the Supplemental Declaration. *See id.*

{28} Having determined that the Supplemental Declaration must be construed together with the Plan, we now conclude that the documents are not ambiguous. The provisions of the Supplemental Declaration logically operate to protect the amenity rights of only those who owned property at the time the documents were executed. Any other interpretation of the agreement would render important portions of the Plan meaningless. *See Bank of N.M. v. Sholer*, 102 N.M. 78, 79, 691 P.2d 465, 466 (1984) (stating that contract must be construed as harmonious whole with every phrase given meaning and significance). For example, Section 4.16(h) of the Plan creates a clear distinction between classes of property owners according to the

date of acquisition of the property. This section allows Defendants to modify the annual assessment structure for those who acquire property after a certain date. However, it also contains a grandfather clause that pertains only to existing property owners. If, as Plaintiffs argue, the Supplemental Declaration were applicable to all property owners, regardless of the date of acquisition of the property, Section 4.16(h) would be impermissibly stripped of all meaning and purpose. *See id.* at 79, 691 P.2d at 466.

{29} In addition, by its express terms, the Supplemental Declaration was executed to facilitate the settlement of an adversary proceeding brought against the Corporation by a group of existing property owners who wanted to protect and clarify their amenity rights during the bankruptcy. Thus, Plaintiffs' contention that the Supplemental Declaration applies to all property owners regardless of the date of acquisition is not supported by a plain reading of the document. *See Casias v. Dairyland Ins. Co.,* 1999–NMCA–046, ¶ 11, 126 N.M. 772, 975 P.2d 385 ("It is also established that the 'courts will apply the plain meaning of the contract language as written in interpreting [the] terms of a contract.'" (quoting *Christmas v. Cimarron Realty Co.,* 98 N.M. 330, 332, 648 P.2d 788, 790 (1982))).

{30} Finally, we "may consider collateral evidence of the circumstances surrounding the execution of the agreement in determining whether the language of the agreement is unclear." *Mark V, Inc. v. Mellekas,* 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993). It is undisputed that the Plan and the Supplemental Declaration were executed within the unique context of a Chapter 11 bankruptcy proceeding. As such, they necessarily reflect the negotiations that took place between existing creditors and the bankrupt Corporation, which was attempting to emerge from the bankruptcy as a profitable enterprise. Thus, it is not reasonable to assume that Defendants agreed to afford all property owners, including those who acquired property well after the documents were executed and who were not affected by the bankruptcy proceeding, the favorable terms asserted by Plaintiffs. *See Nearburg,*

1997–NMCA–069, ¶ 7, 123 N.M. 526, 943 P.2d 560.

{31} Given these considerations, Plaintiffs' position does not reflect a reasonable and fair interpretation of the documents. *See id.* Rather, the Plan and the Supplemental Declaration can be fairly and reasonably reconciled only by concluding that the Supplemental Declaration does not operate to preserve the amenity rights and assessment obligations of those who acquired property after May 24, 1997.

### *Amendment of Complaint*

{32} Plaintiffs argue that the district court erred in denying their motion to amend the complaint. Motions to amend are addressed to the sound discretion of the trial court and will be reviewed on appeal only for an abuse of that discretion. *Rivera v. King,* 108 N.M. 5, 9, 765 P.2d 1187, 1191 (Ct.App. 1988), *limited on other grounds by Williams v. Cent. Consol. Sch. Dist.,* 1998–NMCA–006, ¶ 14, 124 N.M. 488, 952 P.2d 978. "An abuse of discretion occurs when the court exceeds the bounds of reason, considering all the circumstances before it." *Rivera,* 108 N.M. at 9, 765 P.2d at 1191.

{33} Plaintiffs' proposed amendment sought to assert claims for breach of fiduciary duty against AAFPO and for breach of contract against both AAFPO and the Resort. Both of these claims were premised on the contention that Defendants had violated the provisions of the Supplemental Declaration. However, as set forth above, the Supplemental Declaration must be read in conjunction with the Plan. When the documents are construed together, Plaintiffs' additional claims would be futile. *See Stinson v. Berry,* 1997–NMCA–076, ¶ 9, 123 N.M. 482, 943 P.2d 129 (reiterating that futility of amendment is reasonable basis for denying leave to amend). Because granting the motion would have served no purpose, the district court properly denied Plaintiffs leave to amend the complaint.

### *Standing*

{34} Defendants assert that HALO lacks standing to bring suit against either the Re-

sort or AAFPO. Based upon our resolution of the above issues, we need not consider this argument.

*Recording Statute*

{35} Plaintiffs argue that the recording statute prohibited the district court from considering the Plan when assessing the amenity rights of the property owners. *See* NMSA 1978, § 14–8–4 (1981). Specifically, they assert that a court may consider recorded documents only if they have been acknowledged or constitute a judicial decree. Yet, as we have already noted, bankruptcy plans that are approved by the bankruptcy court are enforceable as orders of that court.

{36} In addition, Section 14–8–4 addresses the filing and recording of documents and does not govern the admissibility of documents in a court of law. *See Ammerman v. Hubbard Broad., Inc.*, 89 N.M. 307, 311–12, 551 P.2d 1354, 1358–59 (1976) (stating that the power to prescribe rules of practice and procedure is vested solely in the Supreme Court). Therefore, the district court was free to consider the Plan, regardless of whether it was recorded in accordance with the statute.

*Conclusion*

{37} For the foregoing reasons, we affirm both the district court's grant of summary judgment in favor of Defendants and the denial of Plaintiffs' motion to amend the complaint.

{38} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD and CELIA FOY CASTILLO, Judges.