**CORRECTION PAGE: Cover Page, line 6, Ponderosa Pines Golf Course v. Ponderosa Pines Property, No. 31,489, HnKV, Filed 5/2/13: Changed "IT'S" to "ITS"**

This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**PONDEROSA PINES GOLF COURSE**, LLC

 Plaintiff-Appellant,

v.              **NO. 31,489**

**PONDEROSA PINES PROPERTY OWNER'S ASSOCIATION and ITS INDIVIDUAL MEMBERS; and SKIP PRIDEMORE, President & Director; DRAPER BRANTLEY, Vice President and Director; GAIL CHAMPION, Vice President and Director; ROBERT HOWELL, Secretary and Director; and WALTER THAYER, Director.**

 Defendants-Appellees.

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**James Waylon Counts, District Judge**

Hakanson & Associates
John R. Hakanson
Alamogordo, NM

and

L. Helen Bennett PC
L. Helen Bennett
Albuquerque, NM

for Appellant

Martin, Dugan & Martin
W.T. Martin, Jr.
Carlsbad, NM

for Appellee Ponderosa Pines Property Owners Association

**MEMORANDUM OPINION**

**HANISEE, Judge.**

{1}     Ponderosa Pines Golf Course, LLC (Plaintiff) sought and was denied declaratory judgment allowing it to convert the golf course it owns and operates within the Ponderosa Pines subdivision into some other use.  Plaintiff now appeals the district court's final judgment that the Ponderosa Pines property owners have the right to require that the property at issue remain a golf course.   Because of the representations made to initial purchasers in the Ponderosa Pines development, we affirm.

**I.     BACKGROUND**

{2}     Plaintiff owns a thirty-seven acre golf course located in the Ponderosa Pines subdivision in Otero County.  The subdivision was created and developed in 1973 by El Dorado Land Corporation (El Dorado), and contains 125 building lots, on which fifty homes have been built.  Plaintiff purchased the golf course in 2005.  Despite its efforts to advertise and promote the golf course, Plaintiff has operated the golf course at a loss over the last five years (losing in excess of $200,000 according to Plaintiff's complaint).

{3}     Plaintiff sought declaratory judgment against the Ponderosa Pines Property Owners Association (the Association) and owners of lots within the subdivision (collectively, Defendants) to convert use of the property in question from a golf course into something more profitable. In a motion for summary judgment, Defendants argued that under *Huning v. Potts*, 90 N.M. 407, 564 P.2d 612 (1977); *Ute Park Summer Homes Ass'n v. Maxwell Land Grant Co.*, 77 N.M. 730, 427 P.2d 249 (1967); *Cree Meadows, Inc. v. Palmer*, 68 N.M. 479, 362 P.2d 1007 (1961); and *Knight v. City of Albuquerque*, 110 N.M. 265, 794 P.2d 739 (Ct. App. 1990), an equitable servitude in favor of the individual subdivision property owners precluded Plaintiff from changing the use of the golf course. Defendants contended that because El Dorado induced purchasers to buy lots by representing that the golf course would be part of the subdivision, an equitable servitude in favor of the individual property owners was created that required the golf course property to remain a golf course or open space in perpetuity. *See Knight,* 110 N.M. at 266, 794 P.2d at 740 (holding that any property denominated on subdivision plats as part of a golf course must remain either a golf course or open space).

{4}     Plaintiff opposed the motion, arguing, among other things, the existence of disputed material facts. The district court granted summary judgment in favor of Defendants. Citing Plaintiff's own brief, the district court found that, "[s]ome of the

3

people who ultimately bought lots in the Ponderosa Pines development were told by [El Dorado] that the golf course would remain a golf course, some were told the golf course would remain a golf course by realtors, and others assumed the golf course would remain a golf course." The district court concluded that "by reason of rights created by (i) implied grant, (ii) implied covenant, (iii) easement, and/or (iv) estoppel, . . . Defendants and other Ponderosa Pines property owners have the right to have the Ponderosa Pines Golf Course remain a golf course in perpetuity and that the property be maintained "in a condition of natural beauty and view at least equivalent to that of a golf course." Plaintiff now appeals.

**II.   DISCUSSION**

{5}     The central question in our review of the district court's order granting summary judgment to Defendants is whether the district court properly found that the developer of the Ponderosa Pines subdivision, El Dorado, induced purchasers to buy lots by representing that the golf course would be part of the subdivision. Plaintiff also challenges the type of evidence produced at summary judgment, the district court's taking of judicial notice regarding the general desirability of a golf course, and Defendants' effectuation of service of its motion for summary judgment.

{6}     "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Self v. United*

4

*Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582. "We review these legal questions de novo." *Id.* "On appeal from the grant of summary judgment, we ordinarily review the whole record in the light most favorable to the party opposing summary judgment to determine if there is any evidence that places a genuine issue of material fact in dispute." *City of Albuquerque v. BPLW Architects & Eng'rs, Inc.*, 2009-NMCA-081, ¶ 7, 146 N.M. 717, 213 P.3d 1146. "The movant need only make a prima facie showing that he is entitled to summary judgment. Upon the movant making a prima facie showing, the burden shifts to the party opposing the motion to demonstrate the existence of specific evidentiary facts which would require trial on the merits." *Roth v. Thompson*, 113 N.M. 331, 334-35, 825 P.2d 1241, 1244-45 (1992) (citation omitted).

{7}     Judicial notice is an issue of law, which we review de novo. *City of Aztec v. Gurule*, 2010-NMSC-006, ¶ 5, 147 N.M. 693, 228 P.3d 477. This Court applies a de novo standard of review when considering legal questions concerning a district court's application of the law to the facts of this case. *State v. Foster*, 2003-NMCA-099, ¶ 6, 134 N.M. 224, 75 P.3d 824.

**A.     Disputed Material Facts Did Not Preclude Summary Judgment**

{8}     Defendants moved for summary judgment under the theory that a private right rooted in equity precluded Plaintiff from converting the golf course into something

5

else.  The New Mexico Supreme Court has established that "where land is sold with reference to a map or plat showing a park or like open area, the purchaser acquires a private right, generally referred to as an easement, that such area shall be used in the manner designated." *Ute Park*, 77 N.M. at 735, 427 P.2d at 253.  Our Supreme Court clarified that, "this is a private right, and it is not dependent on a proper making and recording of a plat for purposes of dedication." *Id*.  Our Supreme Court explained that

> [t]he rationale of the rule is that a grantor, who induces purchasers, by use of a plat, to believe that streets, squares, courts, parks, or other open areas shown on the plat will be kept open for their use and benefit, and the purchasers have acted upon such inducement, is required by common honesty to do that which he represented he would do.  It is the use made of the plat in inducing the purchasers, which gives rise to the legally enforceable right in the individual purchasers, and such is not dependent upon a dedication to public use, or upon the filing or recording of the plat.

*Id*.  In other words, "[a] developer may not induce buyers to purchase lots by pointing to the present or planned existence of a park or golf course, while retaining the power to alter the use of the park or golf course." *Knight*, 110 N.M. at 266, 794 P.2d at 740.

{9}     In *Cree Meadows*, our Supreme Court held that "[t]he fee of the golf course area is owned by the plaintiff, but [the] plaintiff's use thereof must be subordinated to the extent of the easement in favor of the owners of any of the property in the subdivision."  68 N.M. at 485, 362 P.2d at 1011.  In *Ute Park*, 77 N.M. at 737, 427 P.2d at 254, our Supreme Court further elaborated on the nature of its holding in *Cree*

6

*Meadows* by stating:

> [a] reference in the deed to a plat, whether recorded or unrecorded, is unnecessary . . . where[] plats were prepared and used in making the sales, where[] the cabinsites were actually staked or marked upon the ground in accordance with the plats, and where[] representations were made to the purchasers that the golf course area would be used as a golf course, a playground, or a recreation area.

(Internal quotation marks and citation omitted.)

{10}    We too have addressed this line of case law, stating that "[t]he private rights created when buyers purchased their lots with reference to the plat are superior to the developer's attempt to reserve the power to alter the use of the areas delineated on the plat as golf course tracts." *Knight*, 110 N.M. at 266, 794 P.2d at 740.  As well, we have noted that "it is immaterial whether the private right of action created in circumstances such as [those described above] is termed an implied grant, an implied covenant, an easement, or a right based on estoppel." *Knight*, 110 N.M. at 266, 794 P.2d at 740.

{11}    Thus, the dispositive issue on the motion for summary judgment was whether the developers represented to purchasers that the subdivision included a golf course by reference to a map or plat.  As evidentiary support for their motion, Defendants attached the deposition transcript of Gisela E. Melkus, who was a partner in El Dorado.  Melkus stated that she personally sold several lots within Ponderosa Pines. Melkus testified that she and her El Dorado partners showed maps of the subdivision

7

demonstrating the location of the golf course to buyers, and that they represented to buyers that the golf course was part of the subdivision. According to Melkus, the golf course was the main selling point for the subdivision. An example of a map like that which Melkus used to sell the Ponderosa Pines subdivision lots was also attached to the motion. It is important to note that this map was not the original used, but rather one that Melkus identified to be like the one she used in selling lots. If undisputed, these facts establish that as a result of the demonstration using the map, that Ponderosa Pines purchasers acquired a private right that the golf course property would be used as a golf course.

{12}    In response, Plaintiff argued that the existence of disputed material facts precluded summary judgment. Plaintiff's brief in response to the motion for summary judgment largely argued that evidence existed that indicated the untrustworthiness of Melkus's testimony, and also asserted that some conflicting evidence existed. Upon examination of the attachments to Plaintiff's response to Defendant's motion for summary judgment, we conclude such non-material peripheral evidence is neither sufficient to impeach Melkus's testimony or character for truthfulness, nor to establish material factual disputes.

{13}    First, Plaintiff argued Melkus lacked credibility because she was never an owner of Ponderosa Pines because her name was not on the deeds. As pointed out by

8

Defendants, Melkus's name was not on the deed because she was a part owner of El Dorado itself, the entity that owned and sold the lots within Ponderosa Pines. Plaintiff provided no evidence to contest Melkus's participation in El Dorado or to challenge her status as an owner or shareholder in that entity.

{14} Plaintiff also attempted to impeach Melkus's testimony by stating that the subdivision had been conceived and platted before Melkus's association with El Dorado, and therefore she did not know what El Dorado intended to do with the golf course. Plaintiff added that Melkus could not have been present for every sales presentation and therefore could not have known whether developers used maps depicting the presence of the golf course in order to promote the sale of the lots to perspective purchasers. These two arguments are non sequiturs: the dispositive issue is whether, in connection with sales of lots, El Dorado induced purchasers by representing that a golf course was part of the subdivision. Regardless of Melkus's involvement in the planning of Ponderosa Pines plats, she personally participated in sales on behalf of El Dorado and confirmed that she and other developers used maps with the golf course visually displayed to encourage prospective buyers to purchase the property. Melkus need not have participated in every sales presentation in order for the district court to conclude that the developers (or at least one of them) used the golf course as a selling point for the subdivision.

9

{15} Plaintiff next attacked the map used during Melkus's deposition, saying that the map was from 1979 and therefore could not have been used in making sales presentations. However, as we have already pointed out, Melkus did not testify that she used that particular map from her deposition in making sales presentations to prospective Ponderosa Pines buyers. Rather, Melkus stated that she showed buyers a map similar to the one used at her deposition.

{16} Plaintiff also argued below that Melkus could not accurately remember events occurring at the time of her involvement with El Dorado. Plaintiff stated that evidence of her faulty memory can be found by examining her depositions. Plaintiff asserted that "prior to her deposition being taken[ by Defendants, Melkus had three] or [four] conversations with Defendants' [c]ounsel, which may account for her comparatively clear memory while being questioned by Defendants' [c]ounsel, but not when being question by Plaintiff's [c]ounsel." Yet, none of Melkus's testimony in response to questions from Plaintiff's counsel contradicts responses provided to defense counsel. Based on our review of her deposition testimony, it appears that Melkus recalled sufficient facts regarding her involvement with Ponderosa Pines and the representations regarding the golf course that she and her fellow developers made to buyers at the time.

{17} Plaintiff lastly contended that contradictory evidence existed to raise questions

10

of fact regarding what developers actually told buyers about the golf course. Plaintiff mainly pointed to the responses it received from interrogatories that it served on the eighty-seven named Defendants in this case. Plaintiff stated:

> Of those who did respond to discovery, thirty-three (33), or thirty[-]eight percent (38%) said there had been no representations made to them that the golf course would always remain a golf course. Eight of those are currently represented by the moving attorney. *Five claimed that they were told by James Manatt [one of the developers] that the golf course would remain.* Ten claimed they were told by realtors not connected to the developers. Four were told by Bill Gayso, who was also a realtor, but one of these said Mr. Gayso sold the property, but made no representations. At least three (3) said that they had dealt with James Manatt and Irene Price, [developers and owners of El Dorado,] but no representations were made. . . . Several said they "assumed" the golf course would always be a golf course. Twenty-two (22) said they received no promotional materials, which would have included any "map" of the subdivision.

(Emphasis added.) Initially, Plaintiff failed to identify whether some Defendants responding to the inquiries purchased the lots from the developers; it appears as though many of them purchased their lots from an intermediate owner. Our case law indicates that any private right to enforce an equitable servitude would arise during the purchase of a lot from the developer, here El Dorado, the original common owner of Ponderosa Pines lots and the golf course. This is because we look to whether the developer's (the grantor's) representation to buyers created a benefit to the lot owner and a burden on the property designated for the golf course, which the developer also owns and therefore has the right to burden. *Knight*, 110 N.M. at 266, 794 P.2d at 740;

11

*see generally Dunning v. Buending*, 2011-NMCA-010, ¶¶ 10-11, 18, 149 N.M. 260, 247 P.3d 1145 (describing the requirements of equitable servitudes, also known as covenants which run with the land).

{18} Furthermore, in the above excerpt from Plaintiff's brief to the district court in opposition to Defendants' motion for summary judgment, Plaintiff stated that some buyers reported that they were told directly by one of the developers that the golf course would remain. This evidence not only corroborates Melkus's deposition testimony, but further supports Defendants' motion for summary judgment, particularly because Defendants seek to enforce a private right pursuant to the existence of an equitable servitude. To prove the origin and enforceability of this private right, Defendants only need to show that the developer represented to some of the buyers that the golf course would remain. *See Rowe v. May*, 44 N.M. 264, 267, 101 P.2d 391, 393 (1940) (noting that surrounding property owners may enforce a covenant if it runs with the land for the benefit of all property owners within a restricted area). Plaintiff's remaining evidence that some Defendants did not have representations made to them individually or that some of them assumed but were not told that the golf course would remain fails to materially refute Defendants' evidence. Plaintiff does not show that these were the original grantees of the lots. Because Plaintiff concedes that some grantees received assurances from El Dorado that the golf

course would remain and there is no requirement for Defendants to demonstrate that such an assurance was made to all grantees of the lots, Plaintiff's argument is insufficient to preclude the imposition of summary judgment in favor of Defendants.

{19}     Accordingly, it appears that Plaintiff failed to establish the existence of disputed material facts regarding whether El Dorado represented to buyers that Ponderosa Pines was to be a golf course community.  The district court's grant of summary judgment was therefore appropriate.

**B.     Defendants Have Produced Evidence of Representations to Home Owners Regarding the Existence of the Golf Course Sufficient to Create an Equitable Servitude**

{20}     Because Defendants have not produced the actual map used by El Dorado to display the Ponderosa Pines lots and the golf course to buyers, Plaintiff argues that there are only "alleged verbal representations" to prove that the developers induced purchasers with the golf course.  Plaintiff contends that verbal representations about the golf course are insufficient to establish the propriety of summary judgment.

{21}     During the proceedings in district court, Defendants produced Melkus's testimony which showed that developers made representations to prospective buyers about the golf course using written maps.  And, Plaintiff produced interrogatory responses from purchasers stating that developers asserted to them that the golf course would remain part of Ponderosa Pines.  As well, an illustrative map was utilized for

13

the purpose of showing the type of document on which the existence and location of the golf course was depicted.

{22} Based upon New Mexico's policy to protect "the right of the defendants and their grantees, who purchased their property in reliance on the existence of the golf course, to have the area preserved as a place of natural beauty and view," we conclude that this evidence is collectively sufficient to prove that representations about the existence of a golf course were made to buyers and that representations were made in the form of maps. *Cree Meadows*, 68 N.M. at 484, 362 P.2d at 1010. Defendants need not have produced the actual map used in making the sales in order to succeed in summary judgment.

**C. The District Court Did Not Commit Reversible Error In Taking Judicial Notice About the Presence of a Golf Course Constituting an Inducement to Purchasers**

{23} In its order of summary judgment, the district court took "judicial notice that the existence of a golf course is an inducement to purchasers of lots abutting the golf course." Plaintiff argues that this is "a disputed adjudicative fact in this case that was improperly drawn in favor of the moving party Association on summary judgment." Plaintiff asserts that "a nearby golf course can be a disincentive to purchase to some homebuyers, because of the physical danger and property damage associated with golf balls being hit into private lands, and that other commercially feasible uses would

[constitute an] equal or greater attraction." Assuming without deciding that it was improper for the district court to take judicial notice as it did, reversible error did not result.

**{24}** In *Ute Park*, our Supreme Court explained that the purchaser's equitable right to preserve the open space comes into existence as a result of "the representations by the [grantor]'s agents in accomplishing the sales of the lots[.]" *Id.* at 733, 427 P.2d at 252. Later, in *Huning*, our Supreme Court described the "inducements" involved in *Cree Meadows* and *Ute Park* as "private rights to the use of land." *Huning*, 90 N.M. at 409, 564 P.2d at 614. Lastly, in *Knight*, this Court concluded that it was sufficient that the buyers "relied on the continued existence of the golf course in purchasing their properties from the developer" to prove that a private right in the form of an easement or equitable servitude existed. 110 N.M. at 266, 744 P.2d at 740.

**{25}** Thus, the taking of judicial notice by the district court in this regard does not bear upon the equitable right of Defendants resulting from existing law applied to the facts of this case. Accordingly, the district court's taking of judicial notice of the existence of a golf course as an inducement to purchase property was not error.

**D.    The Association's Failure to Serve All Defendants With the Motion for Summary Judgment Was Not Fatal to the Motion**

**{26}** The Association served its motion on all counsel of record in the case, but not on unrepresented Defendants. Plaintiff asserts that the Association's failure to serve

15

its motion for summary judgment on all individual Defendants was fatal to the motion.

{27} "The consequences of a failure to abide by Rule 1-005's [NMRA] requirement that motions be served on all parties to a lawsuit depend upon the nature of the paper involved." *Western Bank v. Fluid Assets Dev. Corp*., 111 N.M. 458, 461, 806 P.2d 1048, 1051 (1991). To determine if the failure is fatal, we consider "whether a failure to serve a particular motion is material in affecting the unnoticed party's rights." *Id*. In *Western Bank*, the plaintiff's failure to serve one of the parties "its motion for default and foreclosure . . . caused [that party] to lose the opportunity to attend or prepare for the foreclosure sale." *Id.* As a result, the Supreme Court concluded that the failure to serve the motion was fatal. *Id*.

{28} Here, the motion for summary judgment against Plaintiff would not have materially affected the other Defendants, who largely did not respond to the complaint. The motion benefitted all Defendants and did not interfere with their ability to assert their rights in the lawsuit. Thus, the Association's failure to serve unrepresented co-defendants is not fatal to its motion. We affirm the district court on this ground as well.

**III.   CONCLUSION**

{29}   For the reasons stated herein, we affirm the judgment of the district court.

{30}   **IT IS SO ORDERED.**

16

_____
**J. MILES HANISEE, Judge**

**WE CONCUR:**

_____
**RODERICK T. KENNEDY, Chief Judge**

_____
**MICHAEL E. VIGIL, Judge**